1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10    STEVEN ANTHONY PRELLWITZ,

11                    Petitioner,            No. CIV S-07-0046 JAM CHS P

12          vs.

13    D.K. SISTO, Warden,

14                    Respondent.          <u>FINDINGS AND RECOMMENDATIONS</u>

15    _____/

16    I.       <u>INTRODUCTION</u>

17               Petitioner Steven Prellwitz is a state prisoner proceeding pro se with a petition for

18    a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Mr. Prellwitz challenges a December 13,

19    2005 decision by the Board of Parole Hearings (hereinafter Board) finding him unsuitable for

20    parole.  Mr. Prellwitz claims that the Board's decision violated his right to due process.  Upon

21    careful consideration of the record and the applicable law, the undersigned will recommend that

22    Mr. Prellwitz's petition for habeas corpus relief be granted.

23    II.      <u>PROCEDURAL AND FACTUAL BACKGROUND</u>

24          A.       <u>Commitment Offense</u>

25               The circumstances of Mr. Prellwitz's commitment offense were described in

26    detail at his December 13, 2005 parole suitability hearing, as follows:

                                        1

PRESIDING COMMISSIONER BRYSON: So continuing, I'll read into the record the offense summary, first from the probation officer's report dated December 18, 1985, pages one through seven. "On May 11th, 1984, in the early morning hours, San Jose police officers responded to a reporting party at the 7-Eleven store in San Jose, California. Responding officers reported that the victim, Mr. Russell Prellwitz was observed to have had a facial (indiscernible) which appeared to have been caused by a blunt object. Mr. Russell Prellwitz advised officers that his son, Steven Prellwitz hit him in the face and head with a mallet type hammer. Investigating officers proceeded to the residence of Russell Prellwitz to check on the safety of the mother, Lola (phonetic) Prellwitz, and daughter Christianne (phonetic) Prellwitz. Upon approaching the front door of the residence, officers thought they heard a moaning sound from the interior of the house. The officers observed the front door open and observed Steven Prellwitz running across the living room floor. Steven Prellwitz threw an eight to ten-inch kitchen type knife in the direction of the officers. Additional police units arrived and a systematic search of the residence was conducted. Officers noted that the doorway to the northwest bedroom was fully opened and observed two female bodies lying on the floor in a close proximity to each other. Officers noted that there were signs of a violent struggle. The victim Lola Prellwitz, mother, aged 49, was found lying on her left side with both arms together. She was wearing a salmon colored nightgown that was pulled up above her waist. Officers observed a heavy blood concentration in the chest area with small defense type wounds in the right palm under the thumb and on the right outside wrist. Her entire body from head to foot was smeared with blood. Victim Christianne Prellwitz, sister, aged 23, was lying on her back. Officers observed that she was wearing a dark blue nightgown which was pulled up above the waist and a pair of glasses were resting against the right side of her neck just under her chin. The victim, Christianne Prellwitz, face, neck, and upper body was smeared with blood, and there appeared to be two large stab wounds visible in the center of the victim's throat. Blood smears were also observed on her lower extremities. Officers proceeded to the address of Steven Prellwitz [] as they felt he was possibly there. Officers proceeded directly into the bedroom and placed Steven Prellwitz under arrest."

Secondly, I'm going to read from the Sixth Appellate District Court of Appeals, State of California. This was filed April 24th, 1987. "In the early morning hours of May 11, 1984, Steven Prellwitz, then 26, attacked his 55-year-old father, Russell, in his parents' garage, opening a wound requiring stitches in the back of his father's head and fracturing his forearm with a blow from a rubber mallet, usable for auto repair. Their struggle ended when his wife, Lola, grabbed their son in a headlock. Russell left the house and drove off to seek help thinking Steven would chase him. Instead, another struggle ensued inside the home culminating in

the bedroom of his sister, Christianne. Steven ended the lives of his mother at the age of 49 and his sister at the age of 23. Lola suffered eight mortal life wounds puncturing her heart, lungs, windpipe, and stomach, as well as several bruises and minor cuts. Christianne suffered one mortal knife wound which punctured her windpipe and esophagus and four less serious knife wounds to her neck as well as bruises and other minor lacerations. Steven was quickly arrested and was treated later that day for a collapsed left lung which he thought resulted either when his father hit him with the mallet or when his sister struck him possibly with a table lamp. . . . .

Sir, did you commit this offense?

INMATE PRELLWITZ: Yes, ma'am, I did.

PRESIDING COMMISSIONER BRYSON: Can you explain to us why you were there that day and the events immediately preceding the incident?

INMATE PRELLWITZ: Specifically, I was there to try to get a rental agreement redone between me and my mother. We were the co-executives of an estate. My grandfather had passed away five or six months before, and in his will, he made me and my mother Lola, co-executors. And me and my mom and my sister were all to receive, I guess, an equal portion of the estate. A ranch style house of $135,000. There had been a lot of arguments, and I had obtained a rental agreement and had moved in with my wife and three kids into this residence - - my grandfather's residence, to fix it up. It needed a lot of repair. And after - - the agreement was that we would live there for six months before we would have to sell the residence. My parents had decided to break the agreement and to sell the residence earlier and had obtained a lawyer. I had to do the same. I was advised by the probate lawyer, I think Mr. McCann (phonetic). And it became very heated as far as arguments about the house. There's a lot of family infighting and history going back, especially between my mother and my ex-wife, Gina (phonetic), my first wife. And things just escalated, and then - - . . . .

PRESIDING COMMISSIONER BRYSON: So my thought is if - - had you hired to (sic) lawyer at this point? Were you working with an attorney?

INMATE PRELLWITZ: There was a lawyer that handled the actual will. I think his name was McCann, and he said he wasn't qualified to - - he couldn't represent me because he was already doing the will. And my mother had obtained a lawyer. And he suggested that I get my own lawyer on the rental agreement issue. We had agreed to pay the house payment. I think it was $88 a

1    month, and then my parents wanted to move me out before the six

2    months or to charge us several hundred dollars a month rent.
     . . . .

3    PRESIDING COMMISSIONER BRYSON: Now, beyond or
     before that - -
4

5    INMATE PRELLWITZ: Yes.

6    PRESIDING COMMISSIONER BRYSON:  - - you knew the
     history of your mother's problems.

7    INMATE PRELLWITZ: Yes.

8    PRESIDING COMMISSIONER BRYSON: Psychological
     problems.  And you knew the history of your sister, of course.
9    You knew what was kind of happening with her life as well, right?

10   INMATE PRELLWITZ: Yes, ma'am.

11   PRESIDING COMMISSIONER BYRSON: All right.  So what
     was in your mind?  What did you think you were going to gain by
12   going over to their house and basically apparently, you know,
     again becoming embroiled in this discussion?
13

14   INMATE PRELLWITZ: Yeah, I understand your question.  It's
     points well taken.  My sister wasn't part of the agreement.  The
     agreement was between me and my mother.  We were co-
15   executors.  So I wanted to deal with my mother.  My mother - - I
     think you referred to had a long history of schizophrenia and
16   mental illness.  And she was under a lot of stress, as were we all
     then.  Any my goal was to get her alone, to talk to my mother, and
17   to get her to change this rental agreement because she's the only
     one who could do that between me and my mother.
18

     PRESIDING COMMISSIONER BYSON: What kind of
19   relationship did you have with your mother just one - - on-one at
     that point?
20

     INMATE PRELLWITZ: Well, it was - -
21

     PRESIDING COMMISSIONER BRYSON: Was it adversarial, or
22   what was it?

23   INMATE PRELLWITZ: I'm sorry?

24   PRESIDING COMMISSIONER BRYSON: Was it adversarial?

25   INMATE PRELLWITZ: Oh, adversarial.  No.  No.  My father's
     and me were more adversarial than my mother.  My mom was
26   relatively confused by the whole thing, but she was determined to

4

get us out of the house or to pay an additional rent. It was more centered on her problems with my wife, Gina, which again, went back into our high school days, than it was I think, personally directed against me. I wanted to get my mother alone, and specifically I knew that if I could get my mom alone and talk to my mom alone that I could get an agreement, but not with my father there. I had gone to the residence the weekend before, on the Friday before, on the fourth I believe it was, and tried to wait for my father to leave the house so I could talk to my mother. But he stayed until I think around seven in the morning, and it was obvious that he wasn't going to leave. So I - - me and him - -we just left together. And I didn't bring - - of course, I didn't tell my father that I wanted to talk to my mother alone, because he wanted her to obey the whole issue with the sports car - - my sister had bought a Z28 that was, like $17,000, and they had cosigned for this car. And I believed at the time that that's why they were pressuring us to either pay more on the rent or to move out so the house could be sold more quickly. And I was quite angry about that, that they broke this agreement and that it was over because of a sports car my sister had that they had co-signed. So that was on my mind as I went over there that day, and I was probably angry about that with my father who had signed the loan. And that might have been his concern perhaps why he didn't want my mother to make a new agreement.

PRESIDING COMMISSIONER BYRSON: All right. So continue, then, your story, please.

INMATE PRELLWITZ: So you want me to - - okay, I got you. I'm almost lost - - what happened that morning. Okay. I went over the following Friday, which was the date - - on the 11th. Again, I wanted to wait until my father would leave. He used to leave about 6:30 in the morning, and my mother left an hour or so later to her job. And during that time, when my father let me into the house as he did the week before, and we went into the kitchen, and he had coffee going as I remember. He was fixing some coffee, and he offered me a cup. I didn't drink coffee then. I asked about my dog Raj (phonetic). It's a male collie. We weren't able to keep him at my house because of my wife's allergies so he stayed at my parents' house. And he was out in the garage. So I asked if I could see him, and he said yes. And when I went out to the garage, my dog Raj was out there, and I noticed that my sister's sports car, the Z28 that I mentioned, was out in the garage. I was already mad about it. I didn't even know my sister was - - my sister was living back and forth with her boyfriend. She wasn't often at the residence, so I was surprised to see the car in the garage. I made some comments because when I was playing with Raj, I noticed that there was a couple of pieces of large cardboard under the car. And I made some comments how can this $17,000 dollar car that's such a big deal be leaking oil already. And my father came out to the garage, and said that it wasn't. And he got

down under the car, and during this time there had been an exchange of words between me and my dad about - - he had made some comment about my wife being a warden and my wife - - this went back - - we had a lot of disagreements - - we had a phone conversation a few nights before where he said that - - he put it nicely that she had emasculated me in the marriage, and I was pretty angry. I was basically of a mind set that if he smarted off again kind of thing, that I was going to show him that I was still a man kind of thing and, you know, fight with him. That was in my mind. And my wife encouraged me in that, too. And that was on my mind. And when he bent down and had made the comments that he did, I was up against a picnic table, and I grabbed - - it was a mallet, a long wooden handle with a rubber mallet, and I grabbed it and struck my father as he was kneeling by the sports car. I believe I hit him in the head, and as he got up, I swung at him again, and I think the handle hit him in his arm, perhaps where he broke his left - - I think that's probably the blow that broke the bone in his arm. And he had - - he came up and tackled - - he came up and grabbed me, and we fell against the table. I dropped the rubber mallet that I remember, and my father had picked it up, and we had separated, and that's when I know he swung a blow, and he hit me. And I believe that's where I obtained the injury on my left side. I had fractured ribs, and I believe my lung collapsed. All I knew was I couldn't breather after that point because I grabbed my father, and I threw him into the car. His head hit on the glass part of the window, and I remember I saw blood was on the car window. But I'm not sure if that was later that I saw that in the police reports, on the pictures. But I remember I pushed his head into the car, and we fell to the ground, and as we got up, my father had the rubber mallet. He was holding onto it, and I had my arms around him. And that's when I heard the door open behind me, and my mother came into the garage. And I asked her for help. I think my father testified to this. I'm not sure. But she came up and grabbed me from behind by the throat and pulled me off. And I had to let go of my father because I couldn't catch my breath. And I actually couldn't breathe at all after that. And my father - - out of the corner of my eye, I saw him run out of the garage into the kitchen area, but I don't - - I never saw him after that. And at that point I finally got my mother's arm from around my throat, and I pushed her behind me. She went into some boxes, fell over into some cardboard boxes. It was next to the car there. And I pursued - - I went into the house, and as I got into the kitchen area there, I stopped - -

PRESIDING COMMISSIONER BRYSON: Okay. Just a moment.

INMATE PRELLWITZ: Yes, ma'am.

PRESIDING COMMISSIONER BRYSON: You pursued. You used the word pursued. But what were you pursuing there?

INMATE PRELLWITZ: Well, I wanted to get out of there. The car was pushed up against the wall. There was boxes on both sides of the garage. The door - - I guess the side door of the alley was blocked.

PRESIDING COMMISSIONER BRYSON: What about the main garage door? Was that closed also?

INMATE PRELLWITZ: Yes, that was also closed.

PRESIDING COMMISSIONER BRYSON: Okay.

INMATE PRELLWITZ: So, I went into the house. The house was dark, fairly dark. This was 6:30 or so in the morning, and I went in, and as I went through the door, I realized my father is somewhere here. And I remember when he ran into the house, he ran in so quickly that my first thought was he's going to get a gun. Although personally, I've never known my father to own a gun, but that was what I thought at the time. And as I went into the house, I stopped in the kitchen and realized that I didn't know where my father was. And I didn't - -

PRESIDING COMMISSIONER BRYSON: Describe your father to me relative to you because you're a pretty big man. What was his status?

INMATE PRELLWITZ: My dad - - I'm six-two to six-three, and my father is five-eleven. I have a picture of the family from those days if you'd like to see relative size.

PRESIDING COMMISSIONER BRYSON: Sure. And how old was he at this time? You were 26 I believe?

INMATE PRELLWITZ: 50s. Might have been in his 50s, I guess. . . . .

INMATE PRELLWITZ: Okay. I didn't - - I had gone into the kitchen. I stopped - - there was a large door that went into the living room and another way that went into the back bedrooms. I stopped at the doorway because I couldn't see around the doorway in either direction, and I didn't know where my father was. Thank you very much.

PRESIDING COMMISSIONER BRYSON: And while you're pausing, had you lived in that house?

INMATE PRELLWITZ: No, ma'am.

[INMATE PRELLWITZ]: Okay. I grew up at [a] residence at (sic) Foothill. My parents had just recently purchased this house within the last year or so.

7

PRESIDING COMMISSIONER BYRSON: I see.

. . . .

INMATE PRELLWITZ: I looked down - - as I looked around the corner, and I'm looking at the front door, the front door was closed. There was that wrought iron railing that went all the way down along the corridor where the door was, and I noticed that the door was closed. And at that point is when I heard a noise behind me, and my mother had come into the kitchen following me from the garage, and she came into the breakfast nook area, and she went to the counter and picked up an object - - it was a knife, a carving knife, something about so long. And she told me at that point that I killed my father, that I killed my father and that I was confused and I - - this time here, I couldn't catch my breath. And I didn't know where Dad was. I remembered thinking that when she sees him, she'll know that he's still around here somewhere. And I was also worried that he was going to hit me again, or we would start fighting again. At this point, I really wanted to get out of the residence. I wanted to get home. I knew I was hurt. I knew I had some kind of internal injuries. I didn't know I had a collapsed lung, though. I just knew I couldn't breathe, and I knew my ribs were hurt. So I thought I had internal bleeding, as far as I knew, I was hurt pretty bad. I didn't know where my father was. My mother had - - like I said, she said that I killed my father. She advanced on me with the knife, and I backed up. At this point I thought about running for the front door, but the front door was closed, and my parents had a dead-bolt lock and a chain, and I knew that they kept their house very secure. And I was afraid I wouldn't be able to get it open. I remember thinking I can't get the door open quick enough, she's going to - - my mom is going to be right on top of me. So I went up the hallway, which is - - was right off the door way to the kitchen. And my mother was advancing, and she was saying again that I killed my father and something about me being evil or something like that. And I almost was actually more concerned about my mother than my father was because I'm thinking I'm backing into one person and having another person advancing on me. I moved slowly down the hallway, and I was thinking going into a bedroom and thinking about jumping out of a window when I heard a door open behind me, and I spun around, and in the dark I thought it was my father, by (sic) I guess it was my sister. She had heard the screaming - - my mom was yelling at this time, and she had come out of bed. She was sleeping in her back bedroom, and I grabbed her and her arms - - we kind of came together, and I shoved her back in the room trying to keep getting away from my mother, and we fell. We lost our balance. Chris tripped, and I fell down, and we hit the floor. And this was just inside her bedroom, I guess, and my mother came in. I remember looking up and seeing my mother in the doorway. She came down with the knife, and she landed on me, and that's when I felt the sharp pain in my side, and I thought I had been stabbed. And I shoved my mother off, and she went on

8

side of me I think and hit my sister's bed. And my sister was up against a dresser. And I got to my feet, and my sister was on my - - she was hanging on my back. And I know now that I think she was panicked, and she wasn't trying to hurt me. And I don't remember thinking that she was going to hurt me. But I grabbed a lamp by the top of it and swung it behind me at my sister and it shattered. Pieces went everywhere. It was some kind of ceramic lamp. Later after seeing the police report, I believe this is probably what made the cut on her head. She had a laceration on her head. And as I swung it, I lost my balance, and we both went down on the floor again and bumped into my mother on the floor. And I remember I turned towards Mom, and I saw the knife. The knife was on the floor at this time. I picked up the knife and stabbed at my mother I thought a couple of times. I thought it was two or three times, I think, if I remember the police report or what you read, it was a total of eight or nine times. It didn't seem at the time that I had stabbed her that many times. And I - - my sister was struggling behind me and - - on the floor - - she - - something was hitting me in the back. And I thought she had a piece of lamp in her hand, and I remember I grabbed a piece of white ceramic lamp, and I pushed it into my sister's throat, and I shoved her up against the dresser two or three times to push her as far away from me as I could. And that's what I believe made the cut on her throat, and she suffocated to death because of that. And I remember that they were lying - - after that, I reached over, and I couldn't figure out where my father was and why he hadn't come in and finished my off. I just never understood that. It wasn't until later that I realized that he left the house. The police report - - I never saw him leave or I didn't know he left the residence. I picked up the knife because - - and I wanted to get out of the unit - - and I made my way down the hallway. And I picked up the knife I know for defensive purposes, not to go after my father again, who I thought was in the residence. I never saw any blood. I don't remember seeing any blood. I just remember the thick kind of smell when you've got oil boiling when you're doing spaghetti or something, and I got sick. I fell into the bathroom. I noticed there was a bathroom there, and as I threw up, I had a tremendous amount of pain in my chest, and I passed out because when I came to, I was looking at the bottom - - I was laying on my side, looking at the bottom of the toilet, and I heard a pounding, a steady pounding which I believe must have been the police officers that had responded to the call to come to the unit.

/////

(Answer, Ex. 3. at 15-33.)

      B.    <u>Parole Board Hearing</u>

         At Mr. Prellwitz's December 13, 2005 parole consideration hearing the Board found him unsuitable for parole, concluding that he would pose an unreasonable risk of danger to

1  society or a threat to public safety if released from prison.  Answer, Ex. 4 at 69.  The Board

2  found that Mr. Prellwitz's crime was carried out in an especially cruel and callous manner, and

3  he attacked multiple victims who were abused and mutilated.  Id.  The offense demonstrated an

4  exceptionally callous disregard for human suffering and the motive for the crime was

5  inexplicable or very trivial.  Id.

6      C.    State Habeas Corpus Proceedings

7      1.    Superior Court

8      Mr. Prellwitz challenged the Board's denial in a petition for writ of habeas corpus

9  filed in the Santa Clara Superior Court on May 2, 2006.  (Answer., Ex. 6. at 6.)  The Superior

10  Court issued a reasoned opinion denying that petition on June 30, 2006.  Id. at 2-4.  The Superior

11  Court explained its reasoning as follows:

12      The habeas corpus petition of STEVEN A. PRELLWITZ is
hereby denied.  While Petitioner is correct that the Board was not
13  entirely thorough and accurate in its examination and consideration
of his parole suitability, it appears that, on balance, sufficient
14  evidence exists such that this Court is required to deny the petition.
As stated by the Sixth District: "We will uphold the denial of
15  parole when it appears that the Board would have reached the same
conclusion based on the supported factors and those factors
16  individually or collectively justify that conclusion." (*In re DeLuna*
(2005) 126 Cal.App. 4th 585, 598.)  The instant case presents such
17  a situation.

18      The most glaring error by the Board is its finding that "the
motive for the crime was inexplicable or very trivial in relation to
19  the offense as it involved a real estate deal."  This is a
misconstruction of evidence.  The "real estate deal" was not the
20  motive for the crime but rather was the proverbial final straw
which, added to the years of dysfunctional interactions with his
21  family, caused Petitioner to finally snap.  As noted by the Forensic
Psychologist, "the origins of his life crime lie deep in the roots of
22  this family's history" and "cumulative stress" was a central
"causative factor" in this case.  For the Board to overlook this
23  uncontroverted evidence was error.  As noted by the Court of
Appeal in the matter of George Scott: "under the regulations, the
24  undisputed evidence [Petitioner] committed his offense while
under emotional stress should have been, but was not, considered
25  in his favor." (*In re Scott* (2004) 119 Cal.App.4th 871, 890.)
Petitioner's situation does not appear to be very distinguishable.

26

Another error of the Board's is its reliance on a subjective impression that Petitioner "need[ed] to do more time." Both Board members stated: "How much time is enough? We don't know." Pursuant to *In re Dannenberg* (2005) 34 Cal.4th 1061 the Board is not supposed to consider proportionality (i.e. how much time an inmate has served) and instead must examine each case and inmate individually to determine whether he is "presently unsuitable" and a "continuing danger." (Emphasis added.) However in this case the Board, to some extent, did not make its determination based on Petitioner's present dangerousness but instead based on an impression that Petitioner needed more punishment. This was error because the Judicial Branch sets the sentence, the Legislative Branch, through the statutory provisions for custody credits, essentially sets the MEPD, and the Executive Branch's duty thereafter is to determine, *without regard to punishment*, parole suitability based on the individual's current level of dangerousness. In the numerous habeas petitions this Court has seen the Attorney General consistently asserts that the amount of time/punishment is not a proper consideration under the controlling regulations. The Board should not have relied on this factor in the instant case.

Despite the above errors, the Board appears to have thoughtfully approached this difficult case and the Board's partial reliance on the prolonged nature of Petitioner's attacks along with the undeniable presence of unsuitability criteria § 2402, subd.(c) (1)(A) Cal. Code Regs. title 15, (multiple victims were attacked, injured, or killed in the same or separate incidents) satisfies Due Process.

Id.

2.    California Court of Appeal

As a result of the Superior Court's denial, Mr. Prellwitz brought a petition for writ on habeas corpus in the California Court of Appeal for the First Appellate District. That petition was denied on July 21, 2006. Answer, Ex. 7 at 70.

3.    California Supreme Court

On September 5, 2006, Mr. Prellwitz filed a petition for review in the California Supreme. Answer, Ex. 8 at 2. The California Supreme Court denied that petition on August 22, 2006. Id. at 9. On January 8, 2007, proceeding in pro per, petitioner filed this federal petition for a writ of habeas corpus.

/////

III.    ANALYSIS

    A.    Applicable Standard of Habeas Corpus Review

        Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

        Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

        Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted).  The court looks to the last reasoned state court decision as the basis for the state court

1  judgment.[1] <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).

2        B.     <u>Petitioner's Claim</u>[2]

3            1)     <u>Description of Claim</u>

4          Mr. Prellwitz claims the Board's unsuitability finding violated his right to due

5  process.  Specifically, Mr. Prellwitz claims that the Board's finding was not supported by "some

6  evidence."  Petition at 10.

7            2)     <u>Applicable Law</u>

8          The Due Process Clause of the Fourteenth Amendment prohibits state action that

9  deprives a person of life, liberty, or property without due process of law.  A person alleging due

10  process violations must first demonstrate that he or she was deprived of a liberty or property

11  interest protected by the Due Process Clause and then show that the procedures attendant upon

12  the deprivation were not constitutionally sufficient.  <u>Kentucky Dep't of Corrections v.</u>

13  <u>Thompson</u>, 490 U.S. 454, 459-60 (1989); <u>McQuillion v. Duncan</u>, 306 F.3d 895, 900 (9th Cir.

14  2002).

15          A protected liberty interest may arise from either the Due Process Clause of the

16  United States Constitution or state laws.  <u>Board of Pardons v. Allen</u>, 482 U.S. 369, 373 (1987).

17  The United States Constitution does not, of its own force, create a protected liberty interest in a

18  parole date, even one that has been set.  <u>Jago v. Van Curen</u>, 454 U.S. 14, 17-21 (1981).

19  However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that

20  parole release will be granted' when or unless certain designated findings are made, and thereby

21  gives rise to a constitutional liberty interest."  <u>McQuillion</u>, 306 F.3d at 901 (quoting <u>Greenholtz</u>

22  

23          [1] The last reasoned state court opinion in this matter is the June 30, 2006 opinion of the

24  Santa Clara County Superior Court, Case No. 95622, attached to Respondent's Answer as
Exhibit 6 at 2-4.

25          [2] Mr. Prellwitz lists a number of claims in his petition.  Each of these claims however

26  invokes his due process rights.  This report will therefore analyze Mr. Prellwitz's due process
rights with respect to his suitability hearing.

v. Inmates of Nebraska Penal, 442 U.S. 1, 12 (1979)).  In this regard, it is clearly established that California's parole scheme provides prisoners sentenced in California to a state prison term that provides for the possibility of parole with "a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause."  Irons v. Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion, 306 F.3d at 903; and Allen, 482 U.S. at 377-78 (quoting Greenholtz, 442 U.S. at 12)).  Accordingly, this court must examine whether the deprivation of petitioner's liberty interest in this case violated due process.

It has been clearly established by the United States Supreme Court "that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' Sass, 461 F.3d at 1128-29 (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)); see also Biggs, 334 F.3d at 915 (citing McQuillion, 306 F.3d at 904), or is "otherwise arbitrary," Hill, 472 U.S. at 457.

When assessing whether a state parole board's suitability decision was supported by "some evidence," the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." Irons, 505 F.3d at 851.  Thus, this court must:

> look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" in [petitioner's] case constituted an unreasonable application of the "some evidence" principle articulated in Hill.

Id.

California law requires that the Board "determine whether a prisoner is presently too dangerous to be deemed suitable for parole based on the 'circumstances tending to show unsuitability' and the 'circumstances tending to show suitability' set forth in Cal. Code. Regs., tit. 15 § 2402(c)-(d)." Irons, 505 F.3d at 851-52.

The Irons court described the regulations as follows:

14

> [T]he circumstances tending to show that a prisoner is unsuitable include: (1) the commitment offense, where the offense was committed in "an especially heinous, atrocious or cruel manner"; (2) the prisoner's previous record of violence; (3)"a history of unstable or tumultuous relationships with others"; (4) commission of "sadistic sexual offenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "serious misconduct in prison or jail." Cal.Code. Regs., tit. 15 § 2402(c). Circumstances tending to show that a prisoner is suitable for parole include: (1) the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; . . . (6) the prisoner lacks any significant history of violent crime; . . . (8) the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release"; (9) "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." Cal.Code. Regs., tit. 15 § 2402(d).

Id. at 663 n.4.

In California, the overriding concern in determining parole suitability is public safety and the focus is on the inmate's <u>current</u> dangerousness. In re Dannenberg, 34 Cal. 4th 1061, 1086 (Cal. 2005); In re Lawrence, 44 Cal. 4th 1181, 1205 (Cal. 2008). The California Supreme Court recently stated:

> [T]he Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety [and] the core determination of "public safety" . . . involves an assessment of an inmate's *current* dangerousness. . . . [A] parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts." These factors are designed to guide an assessment of the inmate's threat to society, *if released*, and hence could not logically relate to anything but the threat *currently* posed by the inmate.

In re Lawrence, 44 Cal. 4th at 1205-06 (internal citations omitted). Accordingly, in reviewing a decision by the Board to deny parole to an inmate, "the relevant inquiry is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." Id. at 1212 (citing In re Rosenkrantz, 29 Cal. 4th 616, 658 (Cal. 2002); In re Dannenberg, 34 Cal. 4th at 1071; In re Lee, 143 Cal. App. 4th 1400, 1408 (2006)).

"The 'some evidence' standard is minimally stringent," and a decision will be upheld if there is any evidence in the record that could support the conclusion reached by the fact-finder. Powell, 33 F.3d at 40 (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987)); Toussaint v. McCarthy, 801 F.2d 1080, 1105 (9th Cir. 1986). However, "the evidence underlying the [ ] decision must have some indicia of reliability." Jancsek, 833 F.2d at 1390. See also Perveler, 974 F.2d at 1134. Determining whether the "some evidence" standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or the weighing of evidence. Toussaint, 801 F.2d at 1105. The question is whether there is any reliable evidence in the record that could support the conclusion reached. Id.

      3)    Discussion

The Board cited the following factors to support its denial: (a) that the offense was carried out in an especially cruel and callous manner; (b) that multiple victims were attacked, injured, and/or killed in the same incident; (c) that the victims were mutilated by the act itself as evidenced by the crime scene; (d) that the offense was carried out in a manner that demonstrated an exceptionally callous disregard for human suffering; and (e) that the motive for the crime was inexplicable or very trivial. Answer, Ex. 4 at 69. Each of these factors relates to the circumstances of the commitment offense.

The circumstances of the commitment offense are one of fifteen factors relating to an inmate's unsuitability or suitability for parole. Cal. Code. Regs., tit. 15 § 2402(c)(1)-(d). When denial is based on these circumstances the California courts have stated that:

> A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released. [In re] Dannenberg, 34 Cal.4th [1061] at 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.2005). Factors

16

beyond the minimum elements of the crime include, <u>inter</u> <u>alia</u>, that "[t]he offense was carried out in a dispassionate and calculated manner," that "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal.Code. Regs., tit. 15 § 2402(c)(1)(B), (D)-(E)."

<u>Irons</u>, 505 F.3d at 852-53; <u>see also</u> <u>In re Weider</u>, 145 Cal.App.4th 570, 588 (2006) (to support

denial of parole, the "factors beyond the minimum elements of the crime" "must be predicated

on "some evidence that the particular circumstances of [the prisoner's] crime-circumstances

beyond the minimum elements of his conviction-indicated exceptional callousness and cruelty

with trivial provocation, and thus suggested he remains a danger to public safety.")

In California, "[s]econd degree murder is defined as the unlawful killing of a

human being with malice aforethought, but without the additional elements--i.e., willfulness,

premeditation, and deliberation-that would support a conviction of first degree murder." <u>People</u>

<u>v. Nieto Benitez</u>, 4 Cal.4th 91, 102 (1992). "Malice, for the purpose of defining murder, may be

express or implied. (§ 188.) It is express 'when there is manifested a deliberate intention

unlawfully to take away the life of a fellow creature.' (§ 188; <u>People v. Mattison</u> (1971) 4 Cal.3d

177, 182, 93 Cal.Rptr. 185, 481 P.2d 193.) Implied malice is present "when no considerable

provocation appears, or when the circumstances attending the killing show an abandoned and

malignant heart." (§ 188; <u>People v. Mattison</u>, <u>supra</u>.)" <u>Id.</u> at 102-103.

Under California law,

"all second degree murders by definition involve some callousness – i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others. [Citation.] As noted, however, parole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable." (<u>In re Smith</u> (2003) 114 Cal.App.4th 343, 366.) . . . .

Therefore, to demonstrate 'an exceptionally callous disregard for human suffering' [within the meaning of applicable provisions of the California parole statutes], the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of second degree murder.

17

In re Scott, 119 Cal.App.4th 871, 891 (2004). Such circumstances may include "rehearsing the murder, executing of a sleeping victim, stalking," id., or evidence that the defendant "acted with cold, calculated, dispassion, or that he tormented, terrorized or injured [the victim] before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering." In re Smith, 114 Cal.App.4th at 367.

The Board found that the attack was "carried out in an especially cruel and callous manner in that [petitioner's] trusting family was attacked in their own home." Answer, Ex. 4 at 69. It is not clear however how the location of the murders relates to cruelty or callousness in this instance. The Board also found that the murders were carried out in a manner that demonstrates an exceptionally callous disregard for human suffering because Mr. Prellwitz "at no point despite evident multiple opportunities sought to de-escalate or stop or vacate the crime scene." Id.

Mr. Prellwitz's version of events, if believed by the Board, indicates the murders occurred at the conclusion of the parties' prolonged violent struggle, fueled by years of dysfunctional family interactions and his mothers mental health issues. According to his statement, Mr. Prellwitz was attempting to avoid his mother, who was armed with a knife, while guarding against a possible attack from his father. Just prior to the murders, Mr. Prellwitz, his mother, and his sister were engaged in a violent struggle before Mr. Prellwitz ultimately gained the upper hand and ended their lives. While it is certainly possible that the Board did not believe Mr. Prellwitz's version of event, that is not explicitly indicated by the Board's opinion. If the Board did believe his version of events, it would appear that he did attempt to avoid an altercation with his mother and was surprised by the altercation with his sister.

Regardless, there is no evidence that Mr. Prellwitz rehearsed the murder of his mother or sister, or that he stalked them. His mother and sister were not sleeping at the time they were murdered. There is no evidence that Mr. Prellwitz acted with cold, calculated, dispassion or that he tormented or terrorized his victims. The Board also found that multiple victims were

attacked and that they were abused and mutilated by the attack.  While it is clear that multiple

victims were attacked the Board did not indicate it found the victims were injured for the sake of

increasing or prolonging their suffering.  Further, "the fact that there were multiple victims,

which will never change, cannot be sufficient to deny parole."  In re Weider, 145 Cal.App.4th at

589.

　　　　　While the circumstances of Mr. Prellwitz's commitment offense are certainly

horrific and tragic, it is not clear that the Board found that they go beyond the minimum

elements necessary for conviction of second degree murder.  Absent circumstances beyond the

minimum elements of his crime, Mr. Prellwitz cannot be denied parole based solely on those

minimum elements.  See Irons at 663; see also In re Weider, 145 Cal.App.4th at 588 (to support

denial of parole, the "factors beyond the minimum elements of the crime" must  be predicated on

"some evidence that the particular circumstances of [the prisoner's] crime-circumstances beyond

the minimum elements of his conviction-indicated exceptional callousness and cruelty with

trivial provocation, and thus suggested he remains a danger to public safety.")

　　　　　Regardless of the circumstances of his commitment offense, when considered in

light of the extensive evidence of his in-prison rehabilitation and exemplary behavior over the 20

years between his incarceration and his suitability hearing, they do not seem to be predictive of

his current dangerousness.  In re Lawrence, 44 Cal. 4th  at 1205-06, 1217, 1221; In re Elkins,

144 Cal. App. 4th 475, 498-99 (2006) (internal citations omitted) ("[T]he commitment offense . .

. is an unsuitability factor that is immutable and whose predictive value 'may be very

questionable after a long period of time.' . . . Reliance on an immutable factor, without regard to

or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative

goals espoused by the prison system, and result in a due process violation.").

　　　　　Even if the Board found the circumstances of Mr. Prellwitz's crime had been

especially callous and cruel at the time it was committed, the role of the Board was to conduct an

individualized suitability determination for Mr. Prellwitz  and to focus upon the public safety

risk he then <u>currently</u> posed. <u>In re Lawrence</u>, 44 Cal. 4th at 1205-06, 1217, 1221. The relevant inquiry "is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are <u>probative</u> to the central issue of <u>current</u> dangerousness when considered in light of the full record before the Board or the Governor." <u>Id</u>. at 1221; <u>In re Dannenberg</u>, 34 Cal. 4th at 1070-71. While the Board's decision indicates it found Mr. Prellwitz's commitment offense was especially cruel and callous, the Board did not address how the facts of the commitment offense were probative of his current dangerousness.

With respect to the Board's assertion that the crime was inexplicable or very trivial, in <u>In re Scott</u> the court noted that a finding of "triviality" sufficient to justify the denial of parole must also relate to present dangerousness:

> The offense committed by most prisoners serving life terms is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed "trivial." The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must "normally" be given release dates when they approach their minimum eligible parole dates. (Pen.Code, § 3041, subd. (a).) The governing statute also states that the Board shall set a release date "unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen.Code, § 3041, subd. (b).) This language means a "more lengthy period of incarceration" is called for where the gravity of the offense or offenses of the prisoner in question is more indicative of a danger to the public if the prisoner is released than would ordinarily be the case. The reference in Board regulations to motives that are "very trivial in relationship to the offense" therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented.

<u>In re Scott</u>, at 893.

The Board found that the motive for the attack was "very trivial in relation to the offense as it involved a real estate deal." Answer, Ex 4. At 69. The motive for the attack

appears not to have been the real estate deal, but instead the result of the family's complex dysfunction. The Superior Court found this particular finding to be "the most glaring error by the Board" because the real estate deal was not the motive for the murders, "but rather was the proverbial final straw which, added to the years of dysfunctional interactions with his family, caused Petitioner to finally snap." Answer, Ex. 6 at 3.

After reciting its reason for issuing a denial, the Board went on to state:

> [Mr. Prellwitz's] previous record indicates that you have virtually no prior criminality. The prisoner has programmed in an exceptional manner while incarcerated. The prisoner is highly marketable, both in his chosen ministry and in secular professions. The prisoner has upgraded educationally and vocationally, and he had actively participated in self-help and therapy programs. He also has demonstrated evidence of positive change while incarcerated and is to be especially commended for conduct during a knifing experience while in prison. Overall, the institutional behavior is exceptional. The psychological report dated August 23, 2005, authored by Dr. Koovering generally is favorable for the prisoner's release citing that you had two 115s, one for possession of an unauthorized computer disc in 1989, the other for excessive contract with a visitor in 1992. Also pointing out that you were a victim of a stabbing in 1987, and you, yourself, were not cited for violence in prison. And states - - her report states that aside from the life crime, there was no record of violence, and in view of the above factors, estimated future dangerousness is estimated as low. This panel finds that your parole plans are complete and include all factors this panel could request. . . .
>
> . . . .
>
> Sir, the panel commends you for your institutional record; however, these positive aspects of your behavior do not outweigh the factors of your unsuitability at this time given the magnitude of this crime. We feel that you need to do more time. It boils down to the crime. . . . The Board recommends you get self-help, stay disciplinary free, earn positive chronos. We are requesting a new psychological report before the next hearing, and again, we commend you on your performance. How much is enough time? I do not know. But we want to see another three years, and we want those three years to be very positive years, and we hope you will not lose your positive attitude. It's excellent.

Answer, Ex. 4 at 69-73.

While the Board cited the commitment offense as the reason for its denial, it

appears that its decision was also influenced by the belief that Mr. Prellwitz's crime required further punishment. The Board stated that it felt Mr. Prellwitz needed "to do more time," and that the reason for his continued incarceration "boils down to the crime" but that "[h]ow much time is enough time? I don't know." Answer, Ex. 4 at 71-72.

Upon review, the Superior Court found the Board's decision was not based entirely on Mr. Prellwitz's present dangerousness, but instead the length of his incarceration, stating "...in this case the Board, to some extent, did not make its determination based on Petitioner's present dangerousness but instead based on an impression that Petitioner needed more punishment." Answer, Ex. 6 at 3. The Superior Court correctly held that, "[t]he Board should not have relied on this factor in the instant case." Id.

IV.    CONCLUSION

In evaluating whether the Board's unsuitability decision was supported by "some evidence," the court's analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." Irons, 505 F.3d at 851. Thus it "must look to California law to determine the findings that are necessary to deem [petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence'" was an unreasonable application of the "some evidence" standard. Id.

The Superior Court found that the Board based its decision on the circumstances of Mr. Prellwitz's commitment offense and "an impression that Petitioner needed more punishment." Answer, Ex. 6 at 3. That impression is not relevant to a determination of his suitability for parole. The only relevant finding by the Board to support unsuitability therefore concerns the circumstances of the commitment offense under Cal. Code. Regs., tit. 15 § 2402(c)(1).

"[T]he denial of parole may be predicated on a prisoner's commitment offense only where the Board can 'point to factors beyond the minimum elements of the crime for which

the inmate was committed' that demonstrate the inmate will, at the time of the suitability

hearing, present a danger to society if released." Irons, 505 F.3d at 852. Thus, determining

whether an inmate poses a current danger is not dependent upon whether the commitment

offense is more egregious than similar crimes. Dannenberg, 34 Cal.4th at 1083-1084. Nor is the

determination dependent entirely upon a finding that the circumstances of the commitment

offense "exhibit viciousness above the minimum elements required for conviction of that

offense." In re Shaputis, 44 Cal.4th 1241, 1254-1255 (Cal. 2008). Instead, "the relevant inquiry

is whether the circumstances of the commitment offense, when considered in light of other facts

in the record, are such that they continue to be predictive of current dangerousness many years

after commission of the offense." Id. (citing Rosenkrantz, 29 Cal.4th at 682); (Lawrence, 44

Cal.4th at 1221.)

       "[T]he Board . . . may base a denial-of-parole decision upon the circumstances of

the offense, or upon other immutable facts such as an inmate's criminal history, but some

evidence will support such reliance *only* if those facts support the ultimate conclusion that an

inmate *continues* to pose an unreasonable risk to public safety." Lawrence, 44 Cal.4th at 1221.

The relevant inquiry therefore is not simply whether petitioner's crime was especially callous, or

shockingly vicious or lethal, but "whether the identified facts are *probative* to the central issue of

*current* dangerousness when considered in light of the full record before the Board." Id.

       Here the Board's decision of unsuitability was undoubtedly based on its findings

concerning the nature of the commitment offense. While it is not entirely evident that the facts

of the commitment offense comport with the identified factors according to California case law,

even if they do the Board may only rely on the nature of the commitment offense as a basis to

deny parole when, considered in light of other facts in the record, the offense continues to be

predictive of current dangerousness. In re Lawrence, 44 Cal.4th at 1221; see also Irons, 505

F.3d at 854 ("[I]n some cases, indefinite detention based solely on an inmate's commitment

offense, regardless of the extent of his rehabilitation, will at some point violate due process,

given the liberty interest in parole that flows from the relevant California statutes."); <u>Biggs</u>, 334 F.3d at 917 ("A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."). The Board here did not go beyond the findings of Mr. Prellwitz's commitment offense to address how the offense continues to be predictive of his current dangerousness in light of other facts in the record. The Board did however detail his numerous positive suitability factors.

During his hearing the Board acknowledged Mr. Prellwitz had no juvenile criminal history and his sole adult entry was for a misdemeanor petty theft in 1978 or 1979. Answer, Ex. 3 at 36. Prior to the commitment offense he was honorably discharged from the United States Marine Corps. <u>Id.</u> at 40. At the time of the commitment offense he was employed and attending college. <u>Id.</u> at 39. He had no history of drug or alcohol abuse. <u>Id.</u> at 43.

During his incarceration Mr. Prellwitz earned a Bachelor's degree in 1991 and a Master's of Business Administration in 1993, both from St. John's University. <u>Id.</u> at 56-57. At the time of the hearing, Mr. Prellwitz had the lowest classification score possible for an inmate with a life sentence. <u>Id.</u> at 60. He completed study in five vocational trades and participated in multiple religious education courses, during which he received numerous laudatory chronos. <u>Id.</u> at 61-69. A number of letters were submitted in support of his parole including one from his daughter. <u>Id.</u> at 48.

Mr. Prellwitz's psychological evaluation noted no mental health concerns, found him to be logical, understanding of his role in the crime, possessing good judgment and placed his potential dangerousness in the community at low. Answer, Ex. 4 at 16-22. Most importantly, after over twenty years of incarceration Mr. Prellwitz has had no incidents of violence. To the contrary, Mr. Prellwitz was the victim of a violent stabbing and did not

1  participate in retribution.[3] Id.  The Board found his parole plans were complete and "include[d]

2  all factors this panel could request." Id. at 70.

3       Despite these factors the Board found him unsuitable for parole, stating to Mr.

4  Prellwitz, "[s]ir, the panel commends you for your institutional record; however, these positive

5  aspects of your behavior do not outweigh the factors of your unsuitability at this time given the

6  magnitude of this crime." Id. at 71.  It appears the factors of unsuitability the Board are

7  referring to are those concerning Mr. Prellwitz's commitment offense and the Board's belief that

8  he needed "to do more time", that "[i]t boils down to the crime" but that "[h]ow much time is

9  enough time? I don't know." Id. at 71-72.  As noted by the Superior Court, these concerns are

10 not relevant to a determination of current dangerousness and the Board erred in considering

11 them.  Answer Ex. 6 at 2-3.  Therefore the only valid findings concern the circumstances of Mr.

12 Prellwitz's commitment offense.

13      Pursuant to Lawrence, even though the Board found Mr. Prellwitz unsuitable due

14 to the circumstances of his commitment offense, it needed to further show how those

15 circumstances related to his then current dangerousness in light of the other facts in the record.

16 Here, the Board only reached the circumstances of the offense and did not address how they

17 were indicative of Mr. Prellwitz's current dangerousness.  Because the Board's findings do not

18 amount to a determination of current dangerousness the Superior Court's finding of some

19 evidence to support the findings was unreasonable and a violation of Mr. Prellwitz's right to due

20 process.

21 V.     REMEDY

22      When habeas relief is warranted the district court has considerable discretion in

23 ───────────────

24      [3] According to petitioner, in 1987 another inmate stole his property.  The thief returned
some of the property but objected to petitioner's request for the remainder of his possessions.
25 The thief told petitioner to get a knife and threatened that there would be an altercation on the
prison's exercise yard.  Petitioner refused to get a weapon.  He was later informed the thief was
26 armed and intended to stab petitioner.  Petitioner refused to engage in violence and was later
stabbed.  Answer, Ex. 4 at 18-22.

1   fashioning a remedy "tailored to the injury suffered from the constitutional violation ..." United

2   States v. Morrison, 449 U.S. 361, 364 (1981). The Supreme Court has stated that "[f]ederal

3   habeas corpus practice, as reflected by the decisions of this Court, indicates that a court has

4   broad discretion in conditioning a judgment granting habeas relief. Federal courts are

5   authorized, under 28 U.S.C. § 2243, to dispose of habeas corpus matters 'as law and justice

6   require.' " Hilton v. Braunskill, 481 U.S. 770, 775 (1987) (internal quotation marks omitted); see

7   also Burnett v. Lampert, 432 F.3d 996, 999 (9th Cir. 2005) ("A federal court is vested with the

8   largest power to control and direct the form of judgment to be entered in cases brought up before

9   it on habeas corpus. The court is free to fashion the remedy as law and justice require and is not

10  required to order petitioner's immediate release from physical custody.") (quoting Sandlers v.

11  Ratelle, 21 F.3d 1446, 1461 (9th Cir. 1994)).

12          Because the Board failed to clearly determine Mr. Prellwitz's then current

13  dangerousness and to support that determination by evidence in the record, it is unclear whether

14  Mr. Prellwitz was in fact then "presently too dangerous to be deemed suitable for parole." If he

15  was, then release is not an appropriate remedy even if the Board did not reach this conclusion in

16  the required manner. If he was not, then Mr. Prellwitz is entitled to parole. Based on the

17  evidence in the record, it is not possible to resolve this issue.

18          Under California law:

19          the judicial branch is authorized to review the factual basis of a
            decision of the Board denying parole in order to ensure that the
20          decision comports with the requirements of due process of law, but
            that in conducting such a review, the court may inquire only
21          whether some evidence in the record before the Board supports the
            decision to deny parole, based upon the factors specified by statute
22          and regulation. If the decision's consideration of the specified
            factors is not supported by some evidence in the record and thus is
23          devoid of a factual basis, the court should grant the prisoner's
            petition for writ of habeas corpus and should order the Board to
24          vacate its decision denying parole and thereafter to proceed in
            accordance with due process of law.

25

26  In re Rosenkrantz, 29 Cal.4th at 658. Here the Board's decision is not so much devoid of factual

basis as it is devoid of a full and clear consideration of the specified factors with respect to current dangerousness.

The remedy therefore required by law and justice is to order that Mr. Prellwitz be given a fresh hearing before the Board, for an evaluation in light of this order, regardless of any subsequent hearings he received after the filing of this petition.[4] The Board may then make a finding of Mr. Prellwitz's suitability based on his current dangerousness. As a result, Mr. Prellwitz will either be found suitable for parole or he will be found unsuitable based on his current dangerousness, and that finding may then be challenged in a subsequent habeas petition.

Therefore, in accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be granted;

2. The Board of Parole Hearings be ordered to conduct a hearing in compliance with these recommendations within 90 days of any order adopting these findings and recommendations; and

3. Respondents be directed to file a document confirming that Mr. Prellwitz has received his hearing within 120 days of any order adopting these findings and recommendations.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within ten days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District

---

[4] Only the record before the California Supreme Court may be considered when adjudicating Mr. Prellwitz's federal claim. Holland v. Jackson, 542 U.S. 649, 652 (2004). Whether Mr. Prellwitz had any subsequent Board hearings after filing this claim is therefore irrelevant because the constitutionality of those hearings could not be evaluated in adjudicating this federal claim.

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 3, 2009

_Charlene H. Sorrentino_
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE